ORIGINAL

Approved: _/s/ Amy Lester_
AMY LESTER
Assistant United States Attorney

Before: HONORABLE KEVIN NATHANIEL FOX
United States Magistrate Judge
Southern District of New York

14 MAG 2770

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          : **SEALED COMPLAINT**
                                  :
                                  : Violations of 15 U.S.C. §§
            - v. -                : 78j(b) and 78ff; 17 C.F.R.
                                  : § 240.10b-5; and 18 U.S.C.
                                  : §§ 1343 and 2
CHARLES A. BENNETT,               :
                                  : COUNTY OF OFFENSE:
            Defendant.            : NEW YORK
                                  :
- - - - - - - - - - - - - - - - x

DOC #

SOUTHERN DISTRICT OF NEW YORK, ss.:

BEMPSEY G. CO, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, and charges as follows:

### COUNT ONE
### (Securities Fraud)

1. From at least in or about 2008 through in or about November 2014, CHARLES A. BENNETT, the defendant, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, as set forth above, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud, (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon investors, to wit, BENNETT solicited more than $5 million from investors

based on false and misleading representations that he would use the money to purchase and sell securities when, in fact, BENNETT used the investors' money substantially for his own personal benefit and to repay other investors.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Section 2.)

## COUNT TWO
## (Wire Fraud)

2. From at least in or about 2008 through in or about November 2014, in the Southern District of New York and elsewhere, CHARLES A. BENNETT, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BENNETT solicited more than $5 million from investors, through the use of telephones, electronic communications, and wire transfers, including the transfer of funds from investors into bank accounts in New York, New York, based on false and misleading representations that he would use the money to make legitimate investments with the investors' money when, in fact, BENNETT used the investors' money substantially for his own personal benefit and to repay other investors.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3. I have been a Special Agent with the FBI for approximately eleven years. I am currently assigned to a squad within the FBI that is responsible for investigating violations of the federal securities laws, as well as wire, bank, and mail fraud laws and related offenses. I have participated in numerous investigations of these offenses, and I have made and participated in making arrests of numerous individuals for committing in such offenses.

4. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained

2

during this investigation, directly or indirectly, from other sources, including documents and information provided by investors, a review of bank records and public records, information provided by witnesses who participated in conversations and written communications with CHARLES A. BENNETT, the defendant, and statements made by BENNETT himself. Because this affidavit is prepared for limited purposes, I have not set forth each and every fact I have learned in connection with this investigation. Where conversations and events are referred to herein, they are related in substance and in part. Where dates, figures, and calculations are set forth herein, they are approximate.

## The Scheme to Defraud

5. Based upon interviews of witnesses, a review of documents provided by witnesses, a review of public records, and a review of electronic communications between CHARLES A. BENNETT, the defendant, and others, I have learned that:

    a. BENNETT is an attorney licensed to practice law in the State of New York, but no longer has an active law practice.

    b. Approximately thirteen years ago, BENNETT was employed by a large law firm in New York City (the "Law Firm") where he worked on corporate mergers and acquisitions, among other matters. While at the Law Firm, BENNETT met an individual ("Individual-1") who later founded a successful privately-held investment fund (the "Fund").

    c. During the period of time relevant to this Complaint, BENNETT held himself out to potential investors as having a close personal relationship with Individual-1 and, therefore, the ability to invest others' money in the Fund, which was not otherwise open to small, individual investors. Numerous investors decided to make an investment in the Fund based on this, and other, representations by BENNETT, as set forth more fully below.

    d. BENNETT told individual investors that he himself had invested money in the Fund and that, should they choose to invest, the investors' money would be held in BENNETT's account. BENNETT also led most of the individual investors to believe that they were the only individuals to whom he had extended the offer to invest with him in the Fund.

3

e. The investors typically transmitted money to BENNETT by wire transfer or check. BENNETT provided "promissory notes" to the individual investors as a record of the amounts of money they had given to BENNETT to invest. In addition, BENNETT provided certain individual investors with account statements that purported to show the amount that BENNETT (and the individual investor, through BENNETT) had invested in the Fund.

f. BENNETT told some of the investors that the Fund purchased credit default swaps and/or mortgage-backed securities, and said that he (BENNETT) was required to travel overseas, including to France, in order to manage or oversee the Fund's investments. From time to time, BENNETT also told the investors that he was traveling to meet with Individual-1 about the Fund's investments.

g. BENNETT communicated with individual investors primarily by telephone and email. In these communications, BENNETT told the investors about the purported status of their investments and the purported returns on those investments, and solicited additional funds from investors.

h. BENNETT solicited millions of dollars from more than thirty investors, many of whom were close friends or family members, based on his representations that the money would be invested in the Fund. In truth and in fact, BENNETT never invested any of the investors' money in the Fund[1] or in any other investment vehicle. Instead, BENNETT used the investors' money principally for his own personal benefit and to repay other investors.

### Victim-1 Invests with BENNETT

6. Based on an interview of an individual ("Victim-1") who invested with CHARLES A. BENNETT, the defendant, and a review of documents provided by Victim-1, I have learned the following:

a. Victim-1 has known BENNETT for more than 25 years and considers him a close friend.

b. Between in or about 2008 and in or about November 2014, BENNETT solicited over $1.4 million from Victim-1. During

---

[1] I have spoken with Individual-1, who confirmed that BENNETT has never invested any money with the Fund -- neither BENNETT's own money nor anyone else's. In fact, Individual-1 stated that the Fund has been closed to outside investments for over ten years.

4

the same period of time, Victim-1 received slightly less than $500,000 in returns from BENNETT, leaving Victim-1 with a loss of over $900,000.

  c. BENNETT provided Victim-1 with over twenty promissory notes documenting the amounts of money that Victim-1 gave to BENNETT for investment between December 2008 and April 2010, which ranged from $7,000 to $39,500.

  d. BENNETT communicated with Victim-1 by email about Victim-1's investment. For example, on or about June 5, 2014, BENNETT emailed Victim-1 a "Ledger Account Statement" that purported to be a statement of the amounts that Victim-1 had invested in the Fund with BENNETT since December 15, 2009, along with Victim-1's earnings on those investments. The document calculated Victim-1's total principal as of June 5, 2014 as being over $1.7 million.

### Victim-2 Invests with BENNETT

7. Based on an interview of another individual ("Victim-2") who invested with CHARLES A. BENNETT, the defendant, and a review of documents provided by Victim-2, I have learned the following:

  a. Victim-2 has known BENNETT for more than 25 years and considers him a close friend.

  b. Between in or about 2009 and in or about November 2014, BENNETT solicited more than $1 million from Victim-2. During the same period of time, Victim-2 received approximately $400,000 in returns from BENNETT, leaving Victim-2 with a loss of approximately $600,000.

  c. BENNETT communicated by email with Victim-2 about Victim-2's investment. For example:

    i. On or about July 1, 2013, BENNETT emailed Victim-2 regarding the status of his investment, stating in part, "[T]he three month $688,725 earned 15% way back around beginning April for a return of $103,309 and a total of $792,033. That rolled on April 18th and will end July 18th and earn 15%. Blimey you are getting close to $1mil.!"

    ii. On or about June 12, 2014, BENNETT emailed Victim-2 regarding the status of his

investment, stating in part, "[Y]ou earned 22%
on your $150K for a total of $33,000."

   iii. On or about June 30, 2014, BENNETT sent an
   email to Victim-2 attaching a promissory note
   dated June 27, 2014 for $300,000 that Victim-1
   gave to BENNETT to invest on Victim-1's behalf.

e. BENNETT also provided Victim-2 with account statements purporting to show the balance of BENNETT's -- and by extension therefore, Victim-2's -- investment in the Fund. For example, Victim-2 received from BENNETT a "Quarterly Investor Account Statement" dated March 31, 2014 that purported to show a total capital balance of over $4 million in the account "Charles A. Bennett, Esq.," which Victim-2 understood to contain both BENNETT's money and Victim-2's money. The account statement indicates that the investment is in "Euro CDS/Mortgage Backed Breakout."

### Victim-3 Invests with BENNETT

8. Based on an interview of an individual ("Victim-3") who invested with CHARLES A. BENNETT, the defendant, and a review of documents provided by Victim-3, I have learned the following:

a. In or about October 2013, Victim-3 met BENNETT through a mutual friend, who had previously invested with BENNETT.

b. Between October 2013 and November 2014, BENNETT solicited $100,000 from Victim-3. During the same period of time, Victim-3 received slightly less than $7,000 in returns from BENNETT, leaving Victim-3 with a loss of approximately $93,000.

c. BENNETT communicated by email with Victim-3 about Victim-3's investment. For example:

   i. On or about October 10, 2013, BENNETT sent
   Victim-3 an email containing wire instructions to
   a bank account held in BENNETT's name, including
   an account number and routing number, for Victim-
   3's investment. The same day, Victim-3 confirmed
   by email that Victim-3 had wired $35,000 to
   BENNETT's account.

ii. On or about November 13, 2013, BENNETT emailed Victim-3: "Good news the deal is about up and looks like a return of 8.5%." BENNETT then asked whether Victim-3 wanted to "roll" the investment, that is, reinvest the earnings.

iii. On or about November 18, 2013, BENNETT sent Victim-3 an email containing wire instructions to a different bank account held in BENNETT's name, including an account number and routing number, for an investment by Victim-3. Victim-3 responded: "Thanks. Look for the wire. I'll send it soon."

iv. Later that same day, BENNETT wrote: "Just to let you know I got the $15K . . . . You[ ] earned $2,975 on your $35K and with the $15K your total is $52,975. You are smart and like your decisiveness - in all the ways, not just in. Thanks and let[']s let [Individual-1] do the work now."

v. On or about January 7, 2014, BENNETT emailed Victim-3 to say, "[T]he return came in at a nice 9.6% so you are now at $58,060."

d. On or about January 28, 2014, BENNETT had the following email exchange with Victim-3:

> BENNETT: Yo, huge game changer 10 day deal cooked up with [Individual-1] . . . and it is expected at 25%+. Gotta move fast as doing within 24-36 hours. This is outside the normal ones. Anyone who might be interested is invited to join. Don't need it as I have enough to fund my part to get in but there is extra capacity and more the merrier.
>
> Victim-3: . . . Tell me more. Would be interested if it makes sense.
>
> BENNETT: . . . It's going to be a gangbuster I am sure (25%+ return is our model with risk comparable to the other ones) . . . . It's a

7

> similar play as the other ones but
> with the debacle in commercial
> real estate occurring in Toronto
> and elsewhere in Canada included
> with some of the same in the US
> and Europe, principally Holland.
> We are cranking away as I type on
> the exact properties and expect to
> be done tonight later.
>
> No min, no max for you mate since
> you are a player anyway. Would
> have to move fast though with a
> wire.

  e. The following day, Victim-3 caused $25,000 to be wired to a bank account held by BENNETT at JP Morgan Chase Bank NA ("Chase Bank") after receiving wire instructions, including the account number and routing number, from BENNETT in an email.[2]

  f. In or around October 2014, Victim-3 sought to redeem his entire investment with BENNETT. BENNETT and Victim-3 exchanged a series of emails in which BENNETT repeatedly promised to send a wire transfer to the account designated by Victim-3. Victim-3 asked to meet BENNETT in person to discuss the problem.

  g. On or about November 3, 2014, at 11:34 a.m., BENNETT emailed Victim-3: "[S]orry I meant to get back to you and meet up but I was tied up in New Jersey unexpectedly. Sorry but let's talk after I have confirmed the wire . . . which shall be done this afternoon as promised."

  h. Victim-3 did not receive the redemption from BENNETT as promised.

### The Scheme Unravels

  9. Based upon information and documents provided by the New York City Police Department (the "NYPD"), I have learned the following:

---

[2] I have reviewed bank records from Chase Bank which confirm that, on January 29, 2014, BENNETT's account received $25,000 as the result of this interstate wire transfer.

8

a. On or about November 3, 2014, at 3:00 p.m., CHARLES A. BENNETT, the defendant, attempted to commit suicide by jumping into the Hudson River from a pier located on the West Side of Manhattan.

b. BENNETT was rescued and transferred to a hospital, where he remains in stable condition.

c. The NYPD recovered a suicide note signed by BENNETT.

10. I have reviewed the suicide note authored by CHARLES A. BENNETT, the defendant, which is a sixteen-page handwritten letter with the heading, "A Sad Ending to My Life," and contains the following statements, among others:

a. "I have systematically over the course of five years or so perpetrated a huge Ponzi scheme envelopping [sic] my family and closest friends."

b. "I managed to completely squander the hard earned money that my family and dear friends managed to set aside over the course of their working lives. To be clear about this: the whole . . . investment scheme that so many thought was real was in fact a complete and [sic] fiction of my crazed imagination. Not one trade of credit default swaps was ever attempted by me."

c. "It was all an illusion – again not one trade was ever done. It was a Ponzi scheme pure and simple. . . . The bulk of the funds were used in classic Ponzi scheme fashion to pay off other supposed 'investors' and my absurd lifestyle. All the while pretending I was making everyone wealthy with absurd returns on their money."

11. On or about November 12 and 14, 2014, I spoke to CHARLES A. BENNETT, the defendant, about the statements in the suicide note, among other things. After being advised of his *Miranda* rights and waiving those rights orally and in writing, BENNETT made the following statements, in sum and substance, among others:

a. BENNETT stated that he had solicited at least several million dollars from his close friends and family members, based on the representation that he would invest the money on their behalf.

b. BENNETT stated that he started soliciting money from friends as a way to "borrow" funds to meet his own

9

financial obligations, but that the scheme spiraled out of control.

   c. BENNETT admitted that he had never invested any of the money he received from investors in Individual-1's Fund or in any other investment vehicle. BENNETT also stated that he spent all of the money he received from investors, either on personal expenses -- such as food, travel, and legal representation for his girlfriend -- or on "returns" to other investors.

 WHEREFORE, I respectfully request that an arrest warrant be issued for CHARLES A. BENNETT, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

          _____
          BEMPSEY G. CO
          SPECIAL AGENT
          FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
11th day of December, 2014

_____
HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK