```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK


In re:                              :
                                        Docket #14m2770
UNITED STATES OF AMERICA,            :

                       Plaintiff,    :

    - against -                      : New York, New York
                                       December 12, 2014
CHARLES A. BENNETT,                  :

                       Defendant.    :

------------------------------------ :

                   PROCEEDINGS BEFORE
               THE HONORABLE KEVIN N. FOX,
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:

For the United States       UNITED STATES ATTORNEY'S OFFICE
  Of America:               SOUTHERN DISTRICT OF NEW YORK
                            BY:  AMY LESTER, ESQ.
                            One Saint Andrews Plaza
                            New York, New York 10007


For Defendant:              FEDERAL DEFENDERS OF NEW YORK
                            BY:  JULIA GATTO, ESQ.
                            52 Duane Street, Tenth Floor
                            New York, New York 10007




Transcription Service:  Carole Ludwig, Transcription Services
                        141 East Third Street #3E
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

3

THE CLERK:   United States versus Charles A. Bennett, case number 14m2770.   Counsel, please state your appearance.

MS. AMY LESTER:   Your Honor, Amy Lester for the Government.   Your Honor, before we begin with any substance may I pass up the phone that we're using to do the video conference so that Your Honor can be heard and also see the defendant and Ms. Gatto?

HONORABLE KEVIN N. FOX (THE COURT):   Yes.

MS. LESTER:   Your Honor, also with me at counsel table is Lavalle Jackson, an investigator with our office who has provided the phone that we're using for tonight's video conference. At present at the hospital is Special Agent Ben C. Coe of the Federal Bureau of Investigation.

THE COURT:   Good evening.

MR. JACKSON:   Good evening.

MS. JULIA GATTO:   Good evening, Judge, Federal Defenders of New York by Julia Gatto for Mr. Bennett. Judge, I think if the prosecutor is going to speak it might make more sense to keep the phone at her table because we're having a little trouble hearing her, or maybe she can move closer to the bench.

THE COURT:   All right, that's fine, I'll invite Ms. Lester to come close to the bench.   Good evening to

4

1

2  those of you at the hospital, I'm Judge Fox.  May I have

3  the date and time of arrest of Mr. Bennett, please.

4         MS. LESTER: Yes, Your Honor, the defendant was

5  arrested today at approximately 11:00

6         THE COURT:  Thank you.  Mr. Bennett, the purpose

7  of the proceeding is to advise you of certain rights that

8  you have, to inform you of the charge made against you, to

9  consider whether counsel should be appointed for you, and

10 to determine under what conditions, if any, you might be

11 released.  Do you understand, sir?

12        THE DEFENDANT:  Yes, Your Honor.

13        THE COURT:  You have a right to remain silent,

14 even if you have made statements to authorities already you

15 need not make additional statements. Anything that you do

16 say can be used against you.  You have a right to be

17 released either conditionally or unconditionally pending

18 trial, unless I find that there are no conditions that

19 would reasonably assure your presence in court and the

20 safety of the community. You have a right to be represented

21 by counsel during all court proceedings and during all

22 questioning by authorities.  In that connection, I received

23 earlier via facsimile transmission from the hospital where

24 you are I believe, a copy of a document labeled financial

25 affidavit. I have that before me. Do you have a copy with

5

1

2  you, sir?

3          THE DEFENDANT:  Yes.  Yes, Your Honor.

4          THE COURT:  Would you read the first line in the

5  section labeled employment on the document before you,

6  please?

7          THE DEFENDANT:  Yes, I'm looking at it now.

8          MS. GATTO:  Your Honor, what would you like him to

9  read?

10          THE COURT:  The first line in the box labeled

11  employment.

12          THE DEFENDANT:  Are you now employed?

13          MS. GATTO:  Would you like him to continue?

14          THE COURT:  Yes. Did you answer that question, and

15  if so, read your response to the question.

16          THE DEFENDANT:  No.

17          THE COURT:  Would you continue reading, please?

18          THE DEFENDANT:  Oh, if no, give month and year of

19  last employment.  And that was the year 2000.  And how much

20  did you earn per month, it was about $180,000 -- I'm sorry,

21  per year.

22          THE COURT:  I want you to shift your attention to

23  the section of the document that is labeled obligations and

24  debt and read that section for me, please.

25          THE DEFENDANT:  Debits and monthly bills, rent,

1                                                                    6

2      utilities, loans, other accounts, et cetera.  Description,

3      rent and utilities, $1,470 per month for rent and utilities

4      $300 per month.

5              THE COURT:  All right.  The information that you

6      read to me mirrors the information on the document that is

7      before me, so I believe that we're focusing on the same

8      document.  On that document there appears to be a

9      signature.  Would you raise your right hand, please.  Do

10     you swear or affirm that the statements contained in the

11     financial affidavit that you prepared and from which you

12     read to me are true statements?

13             THE DEFENDANT:  Yes, they are, Your Honor.

14             THE COURT:  And is your true signature on the

15     financial affidavit that you read from?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  Based on the information you've

18     provided through the affidavit I'm satisfied that you're

19     without the means to retain counsel, so I shall appoint Ms.

20     Gatto to represent you.  If you have made false statements

21     through the affidavit, you may expose yourself to a new

22     charge in connection with the false statements. If your

23     financial circumstances change and you're able to retain

24     counsel, you should advice the Court of your changed

25     circumstance.

1

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Ms. Gatto, have you received a copy of

4  the complaint that was filed in this judicial district?

5          THE DEFENDANT:  I have, Your Honor, and I've

6  reviewed it with Mr. Bennett and we waive its public

7  reading.

8          THE COURT:  Very well. Mr. Bennett, you have a

9  right to have a preliminary hearing held in connection with

10  the charge that is outlined in the complaint. At the

11  hearing the Government would have the burden of

12  establishing that there is probably cause to believe that a

13  crime is being committed as set forth in the complaint and

14  that you committed it.  If probable cause is not

15  established, you'll be released from the charge, if it is

16  established the Government will have the right to proceed

17  to trial against you. If you are in custody the hearing

18  will be held within 14 days, if you are not in custody the

19  hearing will be held within 21 days.  No hearing will be

20  held before the date on which it is scheduled, you're

21  either indicted by a grand jury or an information is filed

22  against you by the Government. I shall fix a hearing date

23  after we address the issue of bail.

24          I meant to indicate earlier, so I shall do so now

25  that this presentment proceeding is being conducted

8

remotely since you are at a hospital facility and are
unable to appear in court. I am able to see you through the
use of a telephone device and it's my understanding that
you're able to see me also, is that correct, sir?

          THE DEFENDANT:  Yes, Your Honor.

          THE COURT:  All right, let me ask if both your
counsel and counsel for the Government have received copies
of the Pretrial Services report?

          MS. LESTER:  Yes, Your Honor, I have.

          MS. GATTO:  I have, too, Your Honor.

          THE COURT:  I have also reviewed that report, I am
now going to direct my attention to the representative from
the Government to hear what the Government's position is on
bail.  I will pass the mobile telephone device to her so
that you can see her presentation, Mr. Bennett.

          MS. LESTER:  Your Honor, the Government seeks
detention.  The Government's proposal for detention is
based primarily on the defendant as a risk of flight.  The
Government believes that there is a duty to hold the
defendant accountable for the crimes against his victims
and the only way to assure that he can be held accountable
is to insure obviously his appearance in court. This
defendant, in particular, has already demonstrated that he
is willing to take great risk, indeed some might say the

9

ultimate risk, in trying to avoid prosecution for these

crimes, and that is by attempting to commit suicide. And

now that he has been unsuccessful and is actually being

prosecuted, we think it's very important that he be

detained so that he can actually answer for those crimes.

I'll go through the statutory factors, first

turning to the nature of the offense. As outlined in the

complaint, this is a fraud that stretched over a number of

years, more than 5 years, affected over 30 victims,

including close friends and family members of the

defendant. It was a brazen fraud in which the defendant

blatantly lied to those individuals about the nature of

what he was doing with the money that he gave to them. He

told people that he was investing it on their behalf, but

he, in fact, never invested any of the money, and instead

used it for his own personal expenses and to pay back other

individuals who had invested with him.

He took in millions of dollars from these people,

over $5 million, we believe. It was a complete betrayal of

trust, obviously of people who were extremely close to him,

and also people who had given him what he knew to be

essentially their entire life savings.  But nevertheless,

the defendant continued this fraud and only gave it up when

it became apparent that he would not be able to perpetuate

1                                                              10

2    it indefinitely. When several investors asked for

3    redemptions that the defendant could not meet, that's what

4    prompted him to commit suicide, or attempt to commit

5    suicide, and to write a suicide note that is outlined in

6    the complaint. And that takes me to the weight of the

7    evidence in this case.

8             As outlined again, in the complaint, the suicide

9    note makes clear that the defendant has admitted what he

10   did. The strength of the Government's case is very strong,

11   both because the defendant, himself, has admitted it, not

12   only in the note, but in statements to the agents, as well.

13   we have many statements from the victims as well as

14   documents from the victims outlining the representations

15   that were made by the defendant to them about what would be

16   done with their money. He sent them email correspondence

17   and other documents in which he represented to them that

18   their money was growing. He told them that it was earning

19   returns of certain percentage points and encouraged them

20   not to redeem their money but to reinvest it with them and

21   role it over into a new investment. And most of them did

22   so, and therefore we have, as I say, dozens of victims who

23   had an expectation that their money was growing when, in

24   fact, it was not growing at all and they have lost a great

25   deal of money, if not, in fact, all the money that they

1                                                      11

2  invested with the defendant.

3          Besides the victims' statements and the

4  defendant's own statements, we also have bank account

5  records which corroborate the documents provided by the

6  victims which demonstrate wire transfers to the defendant

7  from the victims, checks deposited by the defendant from

8  the victims, and then also payments, both personal expenses

9  by the defendant, and redemptions, so-called redemptions by

10 the defendant to other victims of the scheme.

11         In addition, the Government has seized the

12 defendant's computer, we've sought search warrants for his

13 email accounts, and for other physical evidence, and those

14 pieced of evidence corroborate the case as well.

15         Turning to the history and characteristics of the

16 defendant, obviously someone who has chosen to betray his

17 closest friends and family members has demonstrated that he

18 is untrustworthy and cannot be, cannot be trusted basically

19 with the opportunity to deal with life on his own. He has

20 no one left, unfortunately, in his community of friends and

21 family members, other than his mother, it appears, who is

22 standing by him.  The Pretrial Services report makes clear

23 that his mother is willing to serve as a third party

24 custodian but in the Government's view that is not

25 sufficient to insure his appearance at court.  First of

all, it presents a number of logistical issues. If the

defendant is residing in Minnesota but has no form of

employment or income, and we understand that the mother's

income and financial situation is also somewhat limited,

the Government is not certain how the defendant would

intend to travel back and forth between Minnesota and New

York for court appearances.  But even putting that aside --

THE COURT:  What about the statute which would

permit the United States Marshal to transport him for court

proceedings?

MS. LESTER:  Well, so that might be a possibility,

Your Honor, but in terms of his own ability to continue a

course of treatment, I mean obviously we recognize that

this is someone who has mental health issues and that that

needs to be looked after, Pretrial recognizes that as well

in recommending continued mental health evaluation and

treatment. But we are not certain or convinced, I think,

that the mother is actually the best person to be looking

after the defendant in his fragile state, and actually

believe that if he is in custody he may be receiving the

best chance of not causing future harm to himself and

receiving further mental health treatment.

He has no employment, he has no place to live

other than his mother's residence. He has no money or

13

financial resources other than his mother that we know of.
And he is obviously a fragile individual who is at high
risk, we believe, of again causing harm to himself or
perhaps just fleeing in some way and not appearing for
court. So for all of those reasons we think that detention
is appropriate in this case.

THE COURT:  Ms. Gatto?

MS. GATTO:  Yes, Judge, thank you.  Let me start
with just a little background on what is the unusualness of
this case. Ms. Lester described some of it, we are
obviously in a hospital. So about six weeks ago Mr. Bennett
attempted suicide by plunging into the Hudson River.  He
swallowed a lot of water and he suffered a lot of injuries,
mostly lung related, and I think his lung actually
collapsed. He is requiring some surgery. So he is here in
Roosevelt Hospital for about six weeks.  They're treating
him really in two ways, one, physically, and two, for his
mental health.  And they are focusing primarily on his
physical condition. So he is here on a regular medical
unit, he see psychiatrists and he is doing really well
physically. So the plan is for him to fully recuperate from
the physical injuries and then the next step for him will
be to go to the psych unit here at Roosevelt Hospital
hopefully where he will have intensive psych treatment

                                                              14

until they believe he can be discharged.

          Judge, let me tell you my proposal and then work
my way back on why I propose it this way. It's really kind
of a two-pronged proposal. I propose that while Mr. Bennett
is under the care of the hospital, before he's discharged,
that he be could be (inaudible) without a bond and without
the typical conditions, except for two conditions, one,
that he may not leave the hospital until he's discharged;
and two, within 24 hours of being discharged he has to
report to the Court, to the Magistrate Court's office.
After he's discharge then my proposal is a more traditional
bail package which is as follows, a sizable bond cosigned
by Mr. Bennett's mother and one of his sisters.  Mr.
Bennett's mother would serve as a third party custodian,
Mr. Bennett would live with his mother in Minnesota and we
would ask that he be supervised in Minnesota and we would
also ask for mental health treatment and strict Pretrial
supervision.

          The concerns the Government raised about traveling
back and forth can easily be addressed as the Court already
alluded in travel orders.  Mr. Bennett is indigent and he
would qualify for the marshals for his paying for his
flight. This case presents an unusual quirk and it's why I
have to propose it the way that I do. If Mr. -- normally,

1                                                                    15

2    Your Honor, let me start this way, normally I would just

3    recommend the bail package that I'm proposing, but it's

4    impossible because Mr. Bennett is in prison for him to,

5    quote-unquote, be released today under those conditions.

6    You're frozen, Judge, I just want to make sure you hear me.

7              THE COURT:  I hear you.

8              MS. GATTO:  Okay, good.  Thank you, Judge.  So

9    because he's here in the hospital he can't sign his bond,

10   which is a typical condition for him to being released. So

11   he will remain in custody even if the bail conditions were

12   set because he can't go to the courthouse and sign the

13   bond. So we're really in an unusual situation, in order to

14   release him, we have to either, we can only really ROR him,

15   although I have another alternative but I think this is the

16   easiest. The Court is really faced with one of two options,

17   either RORing him while he's in the hospital, or having him

18   in custody.

19             Judge, having him in custody has incredible

20   negative consequences that are far more restrictive than we

21   normally see, are super counterproductive and I can't

22   imagine anybody wants it.  If Mr. Bennett is in the

23   hospital and in custody four terrible things happen.  One,

24   he gets transferred to the custody of the service that's

25   contracted by the marshals who have to stand guard in front

1

2    of his door 24 hours a day, and I'll talk about that. But

3    the worst consequence, the incredibly detrimental

4    consequence of this is that Mr. Bennett will have to be

5    restrained in his bed 24 hour a day while he's in the

6    hospital and in, quote-unquote, custody.  He will only be

7    unrestrained when he can get the marshals and he asks them

8    to either take him to the bathroom or if he wants to take a

9    walk around. I can't imagine anyone who is sitting here

10   thinks that that's the appropriate restrictions on this

11   individual. One, this is a non-presumption case, this is a

12   man who has no criminal record. I'll talk a little bit more

13   about his background but the Government is wrong that he

14   has nobody. His mother is sitting here with me, she's been

15   sitting with me in the hospital since 3:00, I understand

16   she sits here every single day in the hospital, she came

17   here from Minnesota. This is somebody who is certainly

18   available and it's someone I can't imagine anyone wants

19   tied to their bed for 24 hours a day. It doesn't make sense

20   under the Bail Reform Act and it doesn't make sense for his

21   health, I can't even think of all the detrimental

22   consequences, for his physical health and for his mental

23   health.

24          There are other big consequences that come from

25   this.  Right now he is treated on the medical unit and the

1                                                                    17

2  expectation if he is released is that he will go to the

3  psych unit here in the hospital that he's treated at and he

4  will have the continuity of the psychiatrists with whom

5  he's formed a relationship. If he's in custody, instead of

6  going to the psych unit here he'll be taken to Bellevue

7  because there is a contract between the BOP and Bellevue

8  and all inmates who are in psych, hospitalized in a psych

9  unit must be at Bellevue. He'll lose his doctors. I will

10  say I've been here for a couple of hours, this is a

11  fabulous, fantastic hospital, I've seen the psychiatrists

12  themselves come, I've seen the relationship he's had and it

13  would be tragic for him to lose that relationship because

14  he's, quote-unquote, in custody and has to go to an

15  entirely different facility that is nothing as high end as

16  this facility.

17          There is also the problem of a guard standing in

18  front of his door for someone who has really significant

19  mental health issues including anxiety and depression, it

20  won't help, it won't support the recovery, it won't help

21  with the mental wellbeing. And there is one additional

22  problem, I don't think it's as big as the others but

23  originally I thought the Government was going to propose

24  detention until he was discharged and then we would talk

25  about a bail package. I was uncomfortable with that for

1                                                              18

2   many reasons, some of them I highlighted but also if we did

3   it that way, if he was detained, in addition to the

4   restraints and the guard and the Bellevue problem, if he

5   were released late in the day and the marshals couldn't

6   bring him to the court, he would have to spend a day, a

7   night at the MCC or the MDC. In his mental state, even

8   after discharge, I don't think a prison facility is the

9   right place.

10          And I'll pause here to respond to something that

11  Ms. Lester said. She said that based on the suicide attempt

12  and the clear mental health issues, she thought a safer and

13  a better place for him might be at the MDC or the MCC

14  pending trial. There is absolutely no mental health

15  treatment at the MCC or the MDC.  There is a therapist that

16  will come around and talk to you but there is no talk

17  therapy, he might be prescribed the medicines he's

18  prescribed here, but it would be nothing like the intensive

19  one on one treatment he's receiving from doctors who

20  already know him and already know his case. So if the

21  Government's argument even in part is that he is going to

22  get better treatment or he's better off in a prison, I can

23  assure you he's not, he is certainly better off here moving

24  around freely and with his doctors.

25          The Government seems, I think the Government's

1

2  only point is that they think that detention is necessary

3  to alleviate a concern of risk of flight. Again, I

4  highlight this is a non-presumption case, this is an

5  individual who has no record.  But the greatest argument in

6  our favor is this is an individual who has been cooperating

7  and working with law enforcement agents for about four

8  weeks. He was admitted six weeks ago, within two weeks of

9  the suicide attempt after the law enforcement made notice

10  of this suicide letter, agents came and saw him, told him

11  that he was under investigation, he waived his Miranda

12  Rights and he has given them a full statement. That's four

13  weeks he's known he's under investigation, that's four

14  weeks where he could walk around, that's four weeks where

15  if he was going to flee this hospital he would have pulled

16  the plug and fled this hospital.  He didn't.  He is

17  committed to his physical and mental wellbeing, from the

18  moment I met him his only concern was can I stay in this

19  hospital.  He was concerned that this, at presentment they

20  were going to take him to prison and he wasn't going to be

21  able to finish the full course of treatment.

22          This is someone who wants one thing only and

23  that's to continue and complete his treatment here. After

24  that he has a supportive family who is going to help him

25  with bail conditions and that's why I've done it in two

20

ways. We recognize that the risk of flight, which I think
is minimal, may be higher when he's not in a facility like
this but that is why I have pretty significant bail
conditions.  If there is any concern, I think there
shouldn't be for the reasons I've said, but any concern
that he could just walk out the door, Your Honor, let me
tell you some things I've learned in my time here at the
hospital. Because Mr. Bennett is on a medical floor,
attempted suicide, he's assigned a one on one suicide
prevention counselor who is outside this door right now.
Their assignment is to have someone 24 hours a day have
their actual eyes on him. We had to ask the counselor to
leave when I was having privileged communications and they
still had to be in a place where they could actually see
him. And even now as we speak the one on one counselor is
outside.  So we are in a medical unit that is very strictly
supervised, and strictly supervised just for Mr. Bennett,
he is not on a floor with others with the same mental
health issues. So he is closely watched. So he doesn't want
to leave and even if he did want to leave there are people
watching him all the time.

As I started, Your Honor, his expected course of
treatment is to complete the physical rehabilitation on
this floor and then he is going to go to the psych floor.

1

2   The psych floor is even higher security than this floor, it

3   is a lock and key floor. Someone can't just leave it.

4   Someone can't just say I'd like to be discharged and leave.

5   We're talking at a minimum sometime next week, maybe the

6   week after he'll go to that floor. At that point on that

7   floor I don't even think the Government could suggest there

8   is any risk of flight, it's a high security floor where he

9   is under lock and key as if he is in prison.

10         Judge, I feel like I must respond to one other

11   thing that the Government said, although I don't know it's

12   necessarily important.  The Government suggested that Mr.

13   Bennett is a risk of flight because he attempted to take

14   his life and that shows some ultimate need to avoid

15   prosecution. There was no indication that anyone had

16   alleged fraud at that point. There was no indication that

17   the, quote-unquote, jig was up.  There are other issues

18   here, this is someone who is suffering with great guilt and

19   remorse, and (inaudible) of responsibility might say above

20   and beyond, it is in no way an indication of someone who is

21   a not going to show up in court, certainly not when his

22   mother signs the bond, the woman who is sitting next to him

23   every day since he tried to kill himself.

24         This is certainly a bailable case, I think bail is

25   appropriate, I'm asking for us to do it in the two ways

1                                                              22

2     that, the bifurcated way that I have proposed, because to

3     do it any other way will be incredibly counterproductive to

4     his care and his wellbeing.

5              THE COURT:  He's not in a secure wing of the

6     hospital now?

7              MS. GATTO:  Correct.

8              THE COURT:  So if he --

9              MS. GATTO:  He's in a public unit.

10             THE COURT:  The counselor who must observe him is

11    not there to restrain him, is that correct?

12             MS. GATTO:  Absolutely not, Your Honor. That's

13    right.

14             THE COURT:  So if he is released into his own

15    recognizance he's free to walk out the door of the

16    hospital.

17             MS. GATTO:  Well that's why I suggested those two

18    additional conditions, that he would be violating a court

19    order if he did walk out.  So it would be released on his

20    own recognizance with two conditions. Those conditions are

21    he is not permitted to leave the courthouse, if he did he's

22    in violation of a court order and he must report to court

23    within 24 hours after leaving.

24             THE COURT:  But what assurance is there that he is

25    going to meet those two conditions?  Once he is released

1

2   into his own recognizance, and I can appreciate, given the

3   information that's being provided to me that he may not be

4   at this juncture exhibiting the best judgment, what

5   assurance is there that he just does not walk out the door

6   because there is no one to restrain him, there is no one to

7   insure that he would remain for the medical attention and

8   then go to the psychiatric wing of the facility to get the

9   mental health treatment that you've been discussing.

10          MS. GATTO:  Well I think that he still could be

11   charged with some sort of bail jumping or some sort of

12   violation of a court order, some sort of contempt.

13          THE COURT:  Oh, that's certain, but the object is

14   to have in place conditions that will insure that a person

15   is, if conditions can be fashioned, be in court whenever he

16   or she needs to be there by direction of judicial officer.

17          MS. GATTO:  Right. So my other proposal for this

18   to deal with this would be as follows --

19          THE COURT:  The phone has now frozen, I am unable

20   to hear Ms. Gatto.  I missed some of what you said, the

21   phone froze, Ms. Gatto, when you began with your second

22   proposal I couldn't hear anything after that.

23          MS. GATTO:  If the Court was concerned that there

24   wasn't enough assurance in the package that I'm proposing,

25   I would just say one other matter, I think his commitment

1

2    to his physical and mental wellbeing is what's driving him

3    here and can give the Court confidence. But if the Court

4    was concerned there wasn't enough weight behind this

5    package in this period of time he's at least on the medical

6    unit, what I would propose is Mr. Bennett's mother could

7    sign the bond.  Mr. Bennett would be willing to sign a bond

8    which would solve this problem, the problem is the only

9    place the bond can be signed, and I've confirmed this with

10   the courthouse, is in a courthouse. So he's not medically

11   well enough to get to the courthouse to sign.

12           Typically what we do is we say, oh, he'll be

13   released tonight on his own signature, but we can't do

14   that. So if we could fashion it with a way that if he would

15   be released, quote-unquote, tonight, because I think it's

16   important that the record indicate that he's released for

17   the various reasons I've explained, with his mother's

18   signature by Monday or Tuesday which she will still be in

19   town, that would give, with a sizable bond, perhaps that

20   would give the Court the confidence it needs, and a

21   condition being he must stay here until he is discharged by

22   his doctors, then if he walked out his mom would be on the

23   line for whatever sizable amount the Court thinks is

24   appropriate here. And if the Court wanted she could take on

25   the third party custodian responsibilities now since she

1                                                                          25

2    intends to stay here until he's discharged, or at least

3    until he gets to the psych unit.

4         So I think, I'm not sure, but it sounds like the

5    Court may agree with me that once he's in the psych unit

6    there is more, we can all have more confidence that he

7    can't just leave if he wants to, with or without bail

8    conditions, it's this period of time where he fully

9    (inaudible) physically that may be the issue. And so I

10   propose that, I'm not quite sure how it can be worded but

11   my proposal would be release tonight with the signature of

12   his mother on a sizable bond by Monday or Tuesday.

13        THE COURT:  All right, let me return to Ms. Lester

14   to hear what her views are on your proposals.

15        MS. LESTER:  Thank you, Your Honor. First, I just

16   want to respond specifically to a few points that Ms. Gatto

17   made. With respect to the restraint while in the custody of

18   the contractor that the US Marshals use when someone is in

19   custody in a hospital, I spoke with the marshals earlier

20   today and they told me that their understanding is that the

21   person is restrained with a shackle on one of their ankles

22   which is attached to the bed, but that there is some room

23   on the shackle so that the person can actually get up from

24   the bed and walk, for example, to the bathroom in their

25   room without having to ask for assistance.

1

2          In terms of another, a few other points that Ms.

3   Gatto made, one specifically about whether the defendant

4   was trying to avoid responsibility or avoid prosecution by

5   attempting to commit suicide, the Government actually does

6   have evidence, not only in the suicide note, itself, but in

7   communications that he defendant had with the victims in

8   the weeks and days before he made his suicide attempt that,

9   in fact, he did believe the jig was up and that he believed

10  it was only a matter of time before, meaning very soon,

11  that he would, in fact, be caught, and that he contemplated

12  going to jail. That is specifically included in the suicide

13  note, not in the portions that were quoted in the

14  complaint, but he does reference that knowing that he will

15  likely face a very long prison sentence and saying that he

16  doesn't think that he's able to cope with that, and so he's

17  seeking another way out.  He acknowledges in the note that

18  that's the cowardly thing to do but nonetheless, he says he

19  doesn't know what else to do.  And, in fact, that is what

20  he attempted to do was to take that way out instead of

21  facing responsibility for his crimes.

22          In terms of the defendant's being cooperative with

23  law enforcement, it is true that the defendant was

24  Mirandized and gave a statement to law enforcement, but

25  it's not entirely true that he could have left the hospital

1                                                              27

2   under his own steam since that time. The defendant has

3   since had a couple of medical procedures, Ms. Gatto

4   mentioned one, that he had to have surgery as a result of a

5   lung infection. He's also had pneumonia and was receiving

6   oxygen. So it's not the case that the defendant was

7   actually able to walk out of the hospital during that

8   entire time and, in fact, chose to stay.  In fact, he was

9   receiving intensive treatment which wouldn't have allowed

10  him to leave the hospital physically.

11          In terms of Ms. Gatto's second proposal, let me

12  just mention that I think that if the defendant were deemed

13  well enough to leave the hospital for a few hours, my

14  understanding is that the marshals would transport the

15  defendant to the hospital to sign a bond. So if Your Honor

16  were inclined to set a bond that could be fulfilled at

17  sometime in the near future, the defendant might be able to

18  come down and sign the bond and then go back to the

19  hospital.

20          For example, if he's released from the general

21  medical ward as Ms. Gatto alluded to in the next week or

22  so, it's probable that at that point because he would be

23  transferred to a psych ward, he would be able to be

24  transported down to the courthouse just for a few hours and

25  sign a bond.  But the Government's view is that if a bond

1

2   is going to be imposed it has to contain substantial

3   conditions, including, we would request, electronic

4   monitoring or home confinement, some sort of assurance as

5   the Court said that this defendant is not going to just

6   choose to ignore his responsibilities as he has shown he is

7   willing to do already.

8           I think that during the time period when he is in

9   the general medical ward, particularly because his mental

10  situation is still tentative, it is important for him to be

11  watched by someone who can insure that he doesn't leave,

12  and not only not leave, but cause harm to himself. The

13  Government's concern is not only that he leave the hospital

14  and not return to court but that he actually harm himself.

15  So I think that really the only way to do that is to have

16  someone watching over him who can actually restrain him

17  from leaving.

18          MS. GATTO:  Judge, if I could briefly respond to

19  the concern about while on the medical unit Mr. Bennett

20  doesn't harm himself that the Government is worried about,

21  that's exactly what the one on one suicide prevention

22  counselor is.  That is always the concern with someone who

23  is in the hospital and that is exactly what they're trained

24  in.  While they are probably not trained in somebody who is

25  leaving the hospital because they are trying to flee from a

1                                                                    29

2   prosecution, exactly the concern raised by the Government

3   is the concern that's here. And if that is really the

4   Government's concern that Mr. Bennett doesn't cause harm to

5   himself, then the hospital and the way the doctors want to

6   treat him at this hospital, is the best place for him to

7   be. And I can guarantee that the mental health

8   professionals who are treating Mr. Bennett do not think

9   it's wise for his mental wellbeing that he be shackled with

10  a leg restraint to his bed even if it's long enough to get

11  to his bathroom.  I've been in his room and I don't think a

12  shackle would be long enough. I spoke, along with the

13  agent, at length with the contract marshals who are sitting

14  here waiting to shackle him if he's in custody and they

15  said that they would have to, every time he had to use the

16  bathroom they would have to shackle him, and if there is

17  any concern on the Government's part of Mr. Bennett not

18  harming himself, then continued treatment at the doctor's

19  direction would be important, with the same doctors and

20  mental health treatment here on the (inaudible), not in

21  prison where there is no mental health treatment. And I

22  feel strongly about saying that because it would be a real

23  tragedy in my opinion for this guy not to get the mental

24  health treatment he so desperately needs and he seems to be

25  doing well. I mean I just met him today.

1

2        I do also want to briefly respond to the idea of

3 electronic monitoring or home confinement when he is

4 released and if he is released to his mother's custody in

5 Minnesota. I thought about that as an option.  Again, one

6 of my main concerns is Mr. Bennett's mental health,

7 wellbeing and treatment. I don't think someone who suffers

8 from anxiety is the ideal person for electronic monitoring

9 and that's why I proposed, I came up with the proposal of

10 the third party custodian to address any concerns of him on

11 the outside.  I know he also, when he gets to Minnesota,

12 wants to try to reintegrate to the community, he's going to

13 be in intensive mental health treatment, he wants to get

14 some sort of small job whatever it will be. If he's on home

15 confinement it is going to be impossible for him to go out.

16 It's true that they will give blackout periods for job

17 search, but when someone is unemployed and on home

18 confinement and has to ask permission every time they go

19 for an interview or put in an application, even if it's at

20 a sporting good store or Starbucks or whatever it is, it

21 takes too much time, someone else gets that job.

22        He wants to go to Minnesota, he wants to deal with

23 this case, he wants to go to mental health treatment and he

24 wants to reintegrate into the community. And that's why I

25 didn't propose it, I thought of it, and so I just wanted to

address it, other than that I don't have any other

responses.

THE COURT:  Until the arrest today, what was the

physical condition of Mr. Bennett?

MS. GATTO:  So I understand that he has recently

been well enough within the last couple of days to even go

off the floor.

THE DEFENDANT:  No, I don't go off the floor.

MS. GATTO:  I'm sorry, Your Honor, let me make

sure I get all the facts.  Your Honor, I'm glad you asked

that question, because I didn't fully understand the facts.

Actually about two weeks ago he was cleared, he was well

enough to go off of the medical unit floor and he had begun

his psych treatment. So that means that physically he was

well enough to be out in the community, it was just his

mental health that was keeping him here. And he was cleared

and he went to the psych unit and he was there for two days

and unfortunately he developed pneumonia and so he came

back.

So to answer your question, he was well enough to

actually even be discharged based on his physical

condition.  He was well enough that he actually was

discharged from this floor. So if the question is

addressing the Government's concern that he didn't leave

32

because he physically couldn't, it's simply not true, he physically could have and indeed he was off of this floor. So thank you for asking that, Judge.

THE COURT:  So if I'm understanding correctly, for a two week period he's on the medical unit and then for two days he's transferred to the psych unit, am I understanding correctly?

MS. GATTO:  I just want to get the timing right. Okay, so now I understand.  First he spent the first ten days here in an ICU, then he was transferred to this floor where he was here about five days or so, and then he was well enough physically to be transferred to the psych unit. He was there and then he got pneumonia and he came back.

THE COURT:  And the period leading up to today's arrest, Mr. Bennett is not in custody, is that right?

MS. GATTO:  Correct, Your Honor.

THE COURT:  So no one is guarding him and restraining him from leaving the facility if he wanted to, if he was physically able to.

MS. GATTO:  Yes, that's correct, but he knew the arrest was coming, it wasn't a surprise, because the agents have been here frequently and there has been no secret about the reason for that.  So while it's true he hasn't been formally arrested, he certainly knew it was coming,

1                                                          33

2   this wasn't a surprise today, he's known that for I think

3   about a month. He's know that for about a month including

4   in the period of time where he was well enough that he

5   certainly could have left.

6          THE COURT:  There are at least five days when he's

7   in the medical unit after leaving the intensive care unit

8   and before going to the psychiatric unit where no one is

9   guarding him, no one is restraining him and he is free to

10  leave the medical facility if he wishes to do so, is that

11  correct?

12         MS. GATTO:  That's correct, and physically able.

13  And In that period he knew that he was under investigation

14  leading to an arrest.

15         THE COURT:  All right, do you want to be heard

16  further, Ms. Lester?

17         MS. LESTER:  No, Your Honor.

18         THE COURT:  I need to check one thing which means

19  I must place the phone down and reach for a book.  So you

20  may not be able to see me for a moment. I was considering

21  continuing the proceeding for a few days but the pertinent

22  statute, 3142 or Title 18, requires me to at this juncture

23  either release the defendant on his own recognizance on

24  conditions or detain him without bail.  I am not persuaded

25  that there are no conditions that could be fashioned to

1

2  permit Mr. Bennett to be at liberty. I've considered the

3  factors that are in Section 3142 of Title 18 in reaching

4  that determination and have considered the arguments urged

5  for detention made by Ms. Lester and the arguments against

6  it made by Ms. Gatto. I am not altogether certain that the

7  type of hybrid proposal that you made, Ms. Gatto, that Mr.

8  Bennett be released into his own recognizance pending his

9  discharge and then have bail conditions imposed upon him

10  really works. If you are true to 3142 which requires that

11  the least restrictive bail conditions be imposed, once it's

12  determined that a person can be at liberty, and if the

13  least restrictive condition is to release him into his own

14  recognizance, to then impose additional conditions such as

15  you were suggesting, seems somewhat intentioned with that.

16          The fact that Mr. Bennett was for about five days

17  aware because of his interaction with the FBI agent who

18  swore to the complaint and maybe other FBI agents, that it

19  was likely that charges would be preferred against him, and

20  was able physically to leave the confines of the hospital

21  but elected not to do so, is strong evidence that he is not

22  inclined to flee. I don't think that he needs to be

23  shackled to his bed, in light of that, and so I'm

24  struggling with what might be a set of conditions that

25  would insure that he's going to attend court when he's

directed to do so and also allow him to obtain the medical

and psychiatric treatment that it has been suggested to me

that he needs.

I don't know how to best accomplish what I want in

the least restrictive way possible since I believe that

there are conditions that should be fashioned for Mr.

Bennett. I don't think that he should be released into his

own recognizance but I'm mindful of what you have urged

upon me Ms. Gatto that the type of restraint that he would

have to be under because he will be in custody if he's not

released into his own recognizance might have an adverse

effect on the treatment that he is getting, his wellbeing,

psychological I'm focusing on, not physical, and I don't

want to do anything to impede that process.  I am wondering

if a bond signing, because it has to be, it appears from

the bond, done in the presence of a deputy clerk, which

wouldn't necessarily require physical presence in the

court, whether if it could be done remotely, that is a

clerk observe Mr. Bennett sign a bond, that that might be

away to address matters since he can't, it sounds like at

this juncture, leave the hospital because that would not be

in his best interest.

MS. GATTO:  Judge, if that was a possibility we'd

have no objection to that. I don't think that that could be

36

1

2   done tonight unfortunately unless the clerks are still

3   there and willing to come here. But we would have no

4   objection to signing a bond here in the courthouse if there

5   was a procedure for that --

6          THE COURT:  You mean in the hospital.

7          MS. GATTO:  I'm sorry, in the hospital, yes,

8   Judge, and my concern would only be this weekend, I assume

9   that could be accomplished on Monday and I would be --

10         THE COURT:  I don't know if it's possible, as I

11  said. I looked at the bond form and it appears that where

12  Mr. Bennett would have to sign declaring certain things to

13  be understood by him, that that has to be executed in the

14  presence of a deputy clerk who is reviewing the bond with

15  him. So I'm wondering whether as we're proceeding remotely,

16  if a similar process could not be put in place to allow a

17  clerk, a deputy clerk to review the bond with Mr. Bennett

18  remotely, observe him as I'm observing him, sign the

19  document, perhaps the document could be placed near the

20  camera so that the clerk could see that it was signed and

21  then have it transmitted and filed and proceed that way. It

22  may be the case that it cannot be done but I'm trying to

23  think of a way to facilitate matters.

24         MS. GATTO:  Judge, I think if the Government had

25  no objection to it, we certainly have no objection to it,

1

2  then it probably can be done.

3          THE COURT:  Well we're not the Clerk of Court and

4  I don't know what constrictions are on the Clerk or Court,

5  either by policy, rule or regulation issued by the

6  Administrative Office of the Court. So I am suggesting that

7  perhaps this might be a means to resolve the matter that

8  we've been addressing but the Clerk or Court may on Monday

9  say that she's unable to do that because of some policy or

10  some regulation issued by the Administrative Office of the

11  Court.  I don't know that, I don't pretend to know the work

12  of the Clerk of Court as intimately as she does, so that's

13  why I'm speaking in the cautious way that I'm speaking, if

14  could be done remotely, I don't know that it can. But if it

15  can be I think that might be a way to address some of the

16  concerns that you mentioned.

17          So maybe it is the case that you should explore

18  that with the Clerk or Court on Monday. I'm prepared to fix

19  bail conditions that would require Mr. Bennett to sign a

20  bond.  And maybe if the Clerk of Court tells you that it's

21  impossible to do a remote signing, then maybe a new

22  application to have his bail conditions examined anew might

23  have to be made to a judicial officer.

24          MS. GATTO:  Judge, I'm happy to talk to the Clerk

25  of the Court and do my own research over the weekend. I

38

would just ask, because I have a real concern over this
weekend, that if the release order requires his signature
before he's released, that this weekend, one, he'll be
shackled, and if this isn't done on Monday there is a small
possibility but a possibility that he could be declared fit
on Monday. That's the absolute earliest it could happen, I
spoke to the psychiatrist, and if that happened while he
was in custody then he'll be removed to Bellevue and he'll
lose his doctors.

So my proposal is what we often do when someone is
released on their own signature with X number of days for a
cosigners signature, if the Court would consider releasing
Mr., quote-unquote, releasing Mr. Bennett tonight with his
signature by Monday, hoping, fingers crossed, that I can
figure out how to do that remotely if not then I will have
another application but we would ask you to consider that,
Judge.

THE COURT:  Well what prevents you from getting a
protective order that delays his transfer from the medical
unit to the psychiatric unit for a number of hours, let's
say, or a day, which would insure that he movement out of
Roosevelt to Bellevue would be postponed while you either
pursue getting a bond signed remotely or having him brought
to the court or something else?

1

2          MS. GATTO:  One, I could certainly try that but I

3  don't know how to do that and I will have to do the

4  research over the weekend, and two, I spoke to the

5  psychiatrist about this, about how we could avoid that if

6  Mr. Bennett were put into custody. The psychiatrist, who is

7  just a psychiatrist and doesn't deal with these proceedings

8  seemed to believe that that is what will happen.

9          Now I appreciate that there may be some process

10  that I can look into, I would be worried about it, just

11  based on my experience with those kinds of things, and I'm

12  also concerned, my concern is two-fold, as you know, it's

13  not just the Bellevue, although I'm incredibly concerned

14  Bellevue --

15          THE COURT:  I have to say that I'm getting a

16  prompt that there's low battery.

17          MS. GATTO:  Oh, yeah, so I don't know if that's

18  Ms. Lester's phone, but if she has a charger.

19          MS. LESTER:  I don't and it's not my phone.

20          THE COURT:  All right.

21          MS. GATTO:  Judge, you can hear me though?

22          THE COURT:  I can hear you and see you, I'm told

23  perhaps we have another 20 minutes.

24          MS. GATTO:  So my point was this, I'm concerned

25  about the transfer to Bellevue and I can certainly look

```
 1                                                      40
 2  into that process. I'm also very concerned about a weekend
 3  at a very delicate stage in his recovery where he is
 4  shackled and there are guards stationed at his door.  I
 5  spoke to his --
 6          THE COURT:  Well, you know, that's a consequence
 7  of having being arrested.  He's in custody.
 8          MS. GATTO:  Yes, Judge, but if he were not in the
 9  hospital, if we were in court, nobody, nobody, not even the
10  Government would say it's appropriate to shackle him to his
11  bed.
12          THE COURT:  But he's in a medical facility and you
13  have to adapt to the circumstance you're in.  I'm not eager
14  to have Mr. Bennett shackled to a be or anything else, I
15  appreciate that that might retard his treatment and
16  recovery.  So that's not a course I'd like to see pursued
17  but you must be mindful that he is arrested now on serious
18  charges and he is in custody and he has to be in a secure
19  type environment and that may mean being shackled.
20          MS. GATTO:   I appreciate that. The timing of all
21  of this which was out of his control, part of the problem
22  here, we're very late on Friday and so what things could be
23  done on a working day can't be done.  We had no control
24  over the timing, the Government did, they elected to do
25  this arrest today. I don't profess to know or even attempt
```

to know why they make the decisions they did, but the

question for the Court is what are the least restrictive

conditions and I don't think anyone thinks that this

condition, being shackled to his bed, even if it's only for

two days assuming I can figure this all out on Monday, is

the least restrictive condition. And I appreciated what the

Court said before about tension of me asking for ROR but

then also saying that bail conditions should be set, and I

think maybe I'll take this opportunity, just if I may

address that again, I think that that makes sense actually,

I don't think that that's (inaudible). I think while he is

in a facility that he 100 percent wants to be at, that he

is committed to be at, that the conditions don't need to be

as restrictive because the risk of flight, which is the

only risk we have here, there is no danger to the public,

the risk of flight is so minimized by the fact that he is

in a hospital, it's not a prison, I know that, it's not a

prison, he could leave but he doesn't want to leave. And we

have no indication that he wants to leave and in fact we

have every indication that he wants to stay.

        So for the purposes of this two-fold procedure, I

say it only because he's in the circumstance he is, if he

were not in the hospital I think bail conditions should be

sent but while in a hospital awaiting to go to a psych

```
1                                                        42
2    treatment for (inaudible) that it makes sense. So I just
3    put it out there because I see where this is going and I'm
4    so concerned that this man is going to take a terrible step
5    back.
6              Just the word shackles, just when the agent was
7    kind enough to come and tell us, Judge, because nobody knew
8    about the shackles when we started today --
9              THE COURT:  Well, you must have imagined that once
10   he's in custody in a hospital facility there is going to be
11   some restraint of some sort, either a guard, or a shackle
12   or combination of both.
13             MS. GATTO:  I did anticipate the guard, Your
14   Honor, I've been here all day since he was arrested, I
15   assumed it would be similar and we had lots of discussions
16   about the guard, but honestly, Judge, I certainly had no
17   idea, I don't think the Government knew, I know the agent
18   didn't know that shackles were part of it. When the agent
19   found out he was so kind that he came in and he said, look,
20   I just want to let you people know that this is the
21   situation, and I could see my client's blood pressure rise,
22   I could hear his breathing becoming more shallow.  Just the
23   thought of it.  Just the thought of it in the state he was
24   at created a whole level of stress that this individual
25   shouldn't be under and doesn't have to be under, under the
```

```
                                                              43
 1

 2  least restrictive conditions for what he's charged with,

 3  Judge.

 4           THE COURT:  All right.

 5           MS. LESTER:  Your Honor, if I could just add

 6  something on issue whether the defendant might be

 7  transferred unwittingly basically to Bellevue.  The

 8  hospital staff has actually been extremely cooperative

 9  throughout the entirety of his stay there and I'm sure that

10  if they were made aware of the situation there would be no

11  problem in asking for a delay of a day or two if that sort

12  of situation arose. So to the extent the Court's concerned

13  about that or Ms. Gatto would have to seek an order, that

14  probably would not be necessary if we just consulted with

15  the hospital staff.

16           MS. GATTO:  Judge, that's not right, I have

17  consulted with the hospital staff, I spoke with Mr., one of

18  many of Mr. Bennett's psychiatrists this morning, that's

19  how I knew this, I didn't even know this was a possibility.

20  She's the one who alerted me to it and when I became so

21  alarmed about it she seemed to indicate that there was

22  nothing they could do, not that they wanted it but there

23  was nothing they could do. So Ms. Lester is wrong, they are

24  super cooperative here and very nice and very kind and very

25  helpful but it's out of their control, it's a financial
```

1

2  contract situation because the financial responsibility for

3  his care transfers from him to the BOP once he's in custody

4  and the BOP has a contract with one hospital.

5        THE COURT:  Are you able to have Mr. Bennett's

6  physician or physicians alert you prior to his discharge

7  sufficient enough so that a proceeding could be held in the

8  court, a bail review hearing in the court?

9        MS. GATTO:  I don't know, Judge, I have not seen

10  any of his physical doctors today, I have only spoken to

11  various psychiatrists who would not be in charge of moving

12  to the psych unit when he would be released here, it would

13  be his medical doctors.  I have been here since about 2:00

14  and I don't think we've seen them and -- so I don't have

15  the answer to that. I know that there must be some sort of

16  releases and stuff that Mr. Bennett must sign, which he

17  certainly would sign.

18        THE COURT:  That's not my concern, what I'm

19  thinking is that prior to his discharge, if there is notice

20  given a bail review hearing could be held, let's say he is

21  going to be discharged on Tuesday and he's given notice of

22  that Monday evening or afternoon or whatever it may be, a

23  bail review hearing could ensue immediately thereafter and

24  the issue of conditions, if any, might be revisited and

25  conditions imposed appropriately to insure that he is

1

2  monitored and gets treatment, if necessary, and will be

3  available to appear in court when needed.

4           MS. GATTO:  Judge, I can certainly endeavor to do

5  that, from my end that leaves a lot up to chance, it's a

6  lot out of my control, it's up to a doctor alerting me when

7  conditions are met which I don't know. I am happy to do

8  that but I'm concerned that it will be too late. I think

9  we're dealing with a scene that moves, that when the forms

10  are filled they're filled, and when the contract takes

11  place, it takes place.  Whatever happens here I'm going to

12  do everything I can to hopefully make sure that continuity

13  of care, but it's always hard for me to let control of

14  things, think some of that will be out of my control.

15           THE COURT:  I don't see why you can't be in

16  contact with the physician if Mr. Bennett authorizes it so

17  that you could be given information about when he is to be

18  discharged.

19           MS. GATTO:  I'm not trying to be difficult, Judge,

20  it's just this is a hospital and just like any time anyone

21  is in the hospital, I've had family members in the

22  hospital, all of a sudden they come in and they say, okay,

23  you're ready to go, and then you're gone.  That's how

24  hospitals operate. I'm sure that this hospital operates

25  that way, too.  I will certainly make all efforts but there

1

2   is a chance under this procedure that he will fall through

3   the cracks and he will be sent to Bellevue, that's the

4   chance we take.  I think that's very sad here.  You have an

5   individual who is willing to sign the bond, you have family

6   members who are willing to sign the bond, this isn't me

7   making an argument to be ROR because he doesn't want to be

8   under conditions, he doesn't think he can survive under

9   conditions, he doesn't thing he can comply with conditions.

10  We all think he can, he wants to, but because he's in the

11  hospital because he tried to take his life six weeks ago,

12  he can't.  And so it's an entirely unusual situation, I

13  recognize, I appreciate the Government's arguments. If this

14  were a typical case and we were on the outside I would not

15  be asking for ROR, but in this circumstance, Judge, where

16  everybody wants to sign a bond, everybody wants conditions

17  to comply with to prove to the Court, but we can't.

18          THE COURT:  All right, I'm going to release Mr.

19  Bennett into his own recognizance and I'll direct that a

20  bail review hearing be scheduled within 24 hours of his

21  discharge from the hospital.  What date would you like for

22  a preliminary hearing date, Ms. Gatto?

23          MS. GATTO:  We'll waive till the 30th day, Your

24  Honor.

25          THE COURT:  It will be the 13th day of January,

1                                                           47

2    2014 --

3            MS. LESTER:  Fifteen.

4            THE COURT:  I'm sorry, 2015.  All right, is there

5    anything else that we need to address?

6            MS. LESTER:  No, Your Honor.

7            THE COURT:  Thank you, good night.

8            MR. GATTO:  Thank you, Your Honor.

9                (Whereupon the matter is adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                                              48

2                          C E R T I F I C A T E

3

4          I, Carole Ludwig, certify that the foregoing

5   transcript of proceedings in the United States District

6   Court, Southern District of New York, United States of

7   America versus Charles A. Bennett, Docket #14mag2770, was

8   prepared using digital electronic transcription equipment

9   and is a true and accurate record of the proceedings.

10

11

12

13

14   Signature_____

15

16   Date:  December 16, 2014

17

18

19

20

21

22

23

24

25