**Federal Defenders**
OF NEW YORK, INC.

David E. Patton
*Executive Director*

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

May 5, 2016

*Via Hand Delivery and ECF*
The Honorable Laura Taylor Swain
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *United States v. Charles Bennett,* 15 CR 20 (LTS)

Dear Judge Swain:

My client, Charles Bennett, is scheduled to be sentenced on May 19, 2016. For the reasons explained below, we ask that the Court impose a prison sentence of one year and one day and a three year period of supervised release. On supervised release, Mr. Bennett will continue with the progress he has made in mental health and drug treatment, and, importantly, Mr. Bennett can work to make restitution to his victims.

Mr. Bennett's case is marked by unusual sadness. His victims were his friends and family whom, by all accounts, he loved dearly. He betrayed their trust and, for many of them, irreparably compromised their financial security. What started in a cloud of cocaine use, a sudden fall into insolvency, and a crippling insecurity snowballed into a years-long Ponzi scheme from under which Mr. Bennett could not escape. He did not use the proceeds of his fraud to finance a lavish lifestyle. At first, he used the money to fund a coke habit and pay basic bills, and then perpetuated the fraud in an effort to pay back the people he loved.

One of the saddest aspects of Mr. Bennett's fraud is that it started because he was too proud to ask his friends and family for a loan (which they gladly would have made to him) and too embarrassed to ask for help for his spiraling-out-of-control cocaine addiction (which they gladly would have given).

The Honorable Laura Taylor Swain                                                              May 5, 2016
Page 2 of 12

Re:   *United States v. Bennett,*
      15 CR 20

Before any of his victims went to the authorities (or before most of them even suspected a fraud), Mr. Bennett was overcome by the guilt of what he had done and he attempted to take his own life. Mr. Bennett's suicide attempt was punctuation to the already tragic story of his fraud.

While Mr. Bennett's offense conduct and suicide attempt are tragic, Mr. Bennett's story since then is remarkably hopeful. He has spent the last year-and-a-half in therapy and treatment asking the very difficult question: how could he do this to the people he loves most? He has reconnected with his family (he lives in his mother's basement in Minneapolis) and has been humbled by their love and support. When not in treatment or with family, Mr. Bennett has spent his pretrial release giving back to his community by, among other things, teaching English as a second language and volunteering at St. Vincent de Paul.

While his suicide attempt was an extreme and irrational way of trying to make amends to the people he hurt, his work over the last year-and-a-half is concretely and positively devoted to that goal. The people who know him best acknowledge his good intentions and have confidence in his ability to do it. What stands out most in this case is the fact that many of Mr. Bennett's victims are themselves urging the Court for leniency. Attached as Exhibits A–H are letters of support from Mr. Bennett's family and friends, each of whom were a victim of Mr. Bennett's crime. In each letter, Mr. Bennett's "victims" articulate why a lengthy prison sentence is not only unnecessary, but contrary to the goals and objectives of our system. For example, Mr. Bennett's mother, sisters, and aunt respectively write:

> [Charlie] has deep remorse and will live with the harm he caused for the rest of his life, but in spite of that, I believe he will be able to do so much good in the world. He is very intelligent, he has been humbled by the love his family has shown him …. My son wants to make amends in whatever way he can. I only hope you give him that opportunity and allow him to continue on this positive path. … I hope and pray you will look at his life as a whole and give him the shortest sentence possible so he can return to his family and be of service to those he harmed as well as others in the community he may be able to help.

The Honorable Laura Taylor Swain                                          May 5, 2016
Page 3 of 12

Re:   *United States v. Bennett,*
      15 CR 20

   Letter from Mr. Bennett's mother, Betty LaSorella, Exhibit A.

   A long prison sentence … delays any positive efforts for Charlie to make amends. From a practical perspective, Charlie will be capable to become financially responsible again and this can only help our family. Having him remain in jail for too long only punishes us further both financially and emotionally. We are all victims, we will not forget, but we also need to move forward, stay together and heal and we need Charlie, with us, to do that.
   Letter from Mr. Bennett's sister, Kelly Joyce, Exhibit B.

   When released, Charlie will be able to find ways to do positive, affirming things that benefit people. I feel that he desperately wants to do positive things, perhaps in a search to find a way to forgive himself.
   Letter from Mr. Bennett's sister, Toni Lasorella Murphy, Exhibit D.

All Charlie wants to do is restore his "victims"; to restore their trust in him and in relationships, generally; to restore them financially by working and making restitution; and, to restore their community by using his many gifts and skills to help and better the people around him. For these reasons, we ask for a modest jail sentence in recognition of the seriousness of Mr. Bennett's offense, but also because it is in the public and Mr. Bennett's interest for him to return to the hard work of restoration as soon as possible.

BACKGROUND

A.   CHARLIE'S CHILDHOOD WAS DEFINED
     BY HIS POTENTIAL AND PROMISE.

As a child, Charlie always was at the top of his class and a star athlete. These accomplishments may be easy to overlook without context. Charlie had a difficult and unstable childhood, and yet he overcame adversity to rise to the top with unusual ease. For his first ten years, he was raised by his parents alongside his five siblings in the turbulent inner-city of Chicago. His earliest home life was marked by poverty, violence in his neighborhood, and his parents' marriage unraveling. His father was an alcoholic. His mother

The Honorable Laura Taylor Swain                                             May 5, 2016
Page 4 of 12

Re:   *United States v. Bennett,*
      15 CR 20

struggled with bipolar disorder. After his parents' divorce, when Charlie was starting his formative teenage years, he shuttled between homes and schools. Before he turned 18, he had moved eight times. He never felt grounded and was largely unsupervised because the adults in his life were struggling themselves.

Charlie's good grades and hard work propelled him to college at the University of Florida, where he earned both a BA and MA, and then to law school at Boston University, where he served as Articles Editor of the Law Review. Charlie financed all three degrees with part-time work and academic scholarships. He graduated law school with a job as an associate at the Manhattan offices of Skadden Arps. He went on to work as an associate at Martin & Maynadier and then Proskauer Rose.

His family and friends back home watched with awe and pride at Charlie's life's trajectory – from a small town Midwestern boy to a successful New York City lawyer. So much of his personal worth and value was derived from his family and friends' image of him as a success. He had made his family and his small town proud and that felt very good to him.

B.   DESPITE APPEARANCES, CHARLIE
     STRUGGLED IN NEW YORK CITY.

But things were not exactly as they appeared. In New York, Charlie was lonely and depressed. His family had a history of mental health issues and it appears that Charlie carried this legacy. He also was addicted to cocaine – a sometimes daily habit for him – and he was an alcoholic who regularly engaged in binge drinking. During binge episodes, Charlie typically consumed several fifths of liquor and, at least, an "8-ball." As he watched people around him couple off and start families, Charlie was emotionally unable to form that kind of connection. Charlie was suffering from severe and undiagnosed clinical depression. Nevertheless, he always presented as together and happy. He was extraordinarily careful not to let his family and friends know about the actual darkness in his life.

In 2000, Charlie blamed his depression and out-of-control life on his job. He quit Proskauer Rose and attempted to start his own practice. However, it was an abysmal failure. For the first several years, he survived on savings. As a

Re:   *United States v. Bennett,*
      15 CR 20

former associate at white-shoe law firms, Charlie had earned a sizeable salary, but he lived a relatively modest lifestyle. He always rented a small studio with a fairly low rent and, absent a trip here or there, did not splurge on luxury purchases. He squirreled away most of his law firm earnings.

But as time passed and his professional failure sharpened, Charlie spent more and more of his then-dwindling savings on cocaine. His habit plummeted him into insolvency. He had trouble even making his $2,000 rent on his studio apartments.

C.   CHARLIE'S DESPERATION SETS IN MOTION A PONZI SCHEME
     AND ENDS IN HIS ATTEMPT TO TAKE HIS OWN LIFE.

What Charlie should have done is turn to his friends and family for a loan, with a promise that he would pay back the money borrowed with interest. But what he did instead is set in motion a Ponzi scheme. In a cloud of cocaine-use, alcohol dependency, and significant mental health issues, Charlie proposed an "investment opportunity" to a handful of friends and family. He guaranteed their investments and promised healthy returns.

In his diminished mental state, Charlie genuinely believed he would figure out a way to pay back the money with interest. Since boyhood, Charlie had used his brains and skill with positive results. He went to good schools, earned top grades, and excelled at prestigious jobs. With blind and irrational ego, he assumed he would figure it out here too.

Charlie never did figure it out. As the Ponzi scheme continued, he became more and more desperate. First, he was desperate not to reveal to the people close to him that he was a failure, and then, he was desperate to pay back the money he "borrowed" from the people he loved. He took in more "investments" to pay back his original "investors" their principal and interest.[1]

One of Charlie's victims (who urges leniency) accurately captures Charlie's state of mind. William Murphy writes, "I can only think that his mind was capable of somehow believing that wrong was right and that lies were truths."

---

[1] Several of Charlie's investors made significant amounts of money.

Re:     *United States v. Bennett,*
        15 CR 20

*See* Victim Impact Letter, submitted by the government. Mr. Murphy then questions "whether [Charlie] was unable or merely unwilling to stop himself from continuing down the path he was taking," noting "it seems that something must be amiss in Charlie's mind." *Id.* In Charlie's mind, he was unable and unwilling to stop until his victims were repaid.

At no point did Charlie grow rich off the scheme. He never left his reasonably priced studio. He continued to maintain a fairly modest lifestyle free of the lavish trappings typically purchased by Ponzi-scheme-offenders. After the beginning, the scheme was entirely devoted to paying people back. In periods of lucidity when he realized he could never repay his victims, Charlie was consumed with remorse. He snorted more cocaine in an attempt to escape overwhelming guilt, but eventually he was defeated.

In November of 2014, before any prosecution had been initiated and before law enforcement even knew his name, Charlie attempted suicide by throwing himself into the ice cold Hudson River. In the hours leading up to his attempted drowning, Charlie drugged himself with vodka and sleeping pills. He left behind a gut-wrenching, 16-page suicide note, explaining that he could no longer bear "the pure emotional weight of the guilt I feel."

When pulled from the River by rescue workers, Charlie's heart already had stopped beating and emergency workers had to revive him. At the hospital, his lung collapsed and he suffered respiratory arrest. In the weeks that followed, he was in and out of the ICU with worsening pneumonia, thrombocytosis, and abscesses and effusions in his lungs. His medical doctors were assisted by a team of psychologists and psychiatrists. He was diagnosed at the hospital with Depressive Disorder NOS and Major Depressive Disorder, Severe, Without Psychotic Features. He spent more than a month hospitalized, most of that time in the intensive care unit. When his physical health was stabilized, Charlie was treated on the strictly supervised mental health ward.

D.      CHARLIE'S EXTRAORDINARY EFFORTS AT REHABILITATION
        POST-ARREST AND POST-SUICIDE-ATTEMPT.

Charlie didn't attempt suicide to avoid jail. He didn't attempt suicide to avoid acceptance of responsibility. He did it in recognition of the wrongfulness of his actions and his need to punish himself for it. At that point in time, it was the

The Honorable Laura Taylor Swain                                  May 5, 2016
Page 7 of 12

Re:   *United States v. Bennett,*
      15 CR 20

only way he could see to accept responsibility. As his mother poignantly explains,

> [T]aking his life was not about escaping responsibility, for all I have seen him do since is take responsibility. Every day I see him struggle with his sorrow and guilt and the pain harm and betrayal he caused. Every day I see him try to make amends to his family by seeking ways to help.
> Exhibit A.

A year-and-a-half has passed since Charlie's suicide attempt, and every day of that time has been spent accepting responsibility in a far more productive and positive manner than his failed suicide attempt. [2] He is in treatment and therapy. He volunteers within his community. And, he gives back to his family.

Charlie has been engaged in an intensive mental health treatment regime and meets regularly with both psychologists and psychiatrists. While on pretrial release, he has taken medications for his mental health issues for the first in his life. Most significantly, he is confronting decades of repressed feelings and the emotional root causes for his offense. He is also learning how to process the overwhelming sorrow and remorse with which he struggles.

Charlie has maintained his sobriety without any relapses. Although he struggles with urges to drink and use, he continues to bravely persevere with his sobriety. He receives drug treatment as part of his mental health counseling, and he attends weekly AA meetings at House of Hope. Additionally, he has connected with a support group specifically for lawyers

---

[2] In other ways, Charlie's post-suicide-attempt actions have illustrated his full acceptance of responsibility. He has cooperated with all authorities in connection with this prosecution and collateral proceedings. While still in the hospital and before counsel was appointed, Charlie waived his *Miranda* rights and spoke extensively with FBI agents, providing a full confession and helping to identify victims and loss amounts. Through counsel, he has offered to assist to a lawyer who was hired by a victim with a forensic calculation of the victim's loss. And, shortly after the SEC initiated a civil proceeding, Charlie entered into a consent judgment agreeing to financial penalties and a ban from the industry.

The Honorable Laura Taylor Swain                                      May 5, 2016
Page 8 of 12

Re:   *United States v. Bennett,*
      15 CR 20

recovering from alcoholism called Lawyers Concerned for Lawyers.

At the start of his treatment, Charlie could not even acknowledge that he had a drug or alcohol problem. Indeed, one of his longstanding and core problematic emotional issues (exploration of which is a large focus of his therapy sessions) is his difficulty in admitting failure or seeking help. Today, however, and thanks in full measure to therapy, Charlie identifies as an addict and is working tirelessly at confronting his disease. One of Charlie's sponsors, D. Patrick Houlton, comments on the "notable changes" in Charlie as a result of his work with AA and Lawyers Concerned for Lawyers. *See* Exhibit I. Mr. Houlton remarks, Charlie "has become much less self-centered and his thinking is clear, present to the moment and honest." *Id.*

Charlie's admirable progress also is revealed in the progress notes prepared by one of the healthcare providers who counseled Charlie for the first third of his release, attached in reverse chronological order at Exhibit J.[3] While at the start of his therapy Charlie "minimiz[ed]" his alcohol and cocaine use, "was adamant that he is not an alcoholic;" and "ha[d] limited insight into the impact his substance use and mental health [have] on his life areas," within two months of treatment he identified as an alcoholic and explained that "it felt ok to say it." *Compare* 2/2/15 and 2/10/15 Progress Notes *with* 3/17/15 Progress Note. Through counseling, Charlie became "more willing to entertain the idea that his substance use may have had a negative impact on some areas of his life." *Id.* Consequently, he discovered a new willingness "to discuss emotional or difficult issues and to look at them more objectively." *Id.,* 3/31/15 Progress Note. With time, Charlie began exercising (4/14/15 Progress Note); reading self-help books (3/17/15 Progress Note); and talked about reengaging in the work force with "insight" (5/19/15 Progress Note).

In short, Charlie's progress in counseling is tangible and documented. Charlie "participate[s] fully in session" and consistently is "receptive to

---

[3] Also, attached as Exhibit K is a letter from one of Charlie's treating psychiatrists confirming that, in addition to counseling, Charlie "received standard psychiatric care, including medication and encouragement to attend counseling which he did, all of which was effective in supporting his sobriety, elevating his mood and restoring his resilient perspective."

The Honorable Laura Taylor Swain                                        May 5, 2016
Page 9 of 12

Re:   *United States v. Bennett,*
      15 CR 20

feedback." *Id.*, *generally*. Although he has explored a host of important emotional and mental issues, his main focus – as indicated under the "patient input" section of the reports – always has been his "guilt and shame due to his actions that impacted other people." *Id.*

Through counseling, Charlie has discovered that one way to grapple productively with his overwhelming feelings of guilt is to focus on good works and deeds. To that end, today he spends his free time volunteering (*see, e.g.,* Exhibit L) and helping the family members who have so generously welcomed him back into their fold.

His efforts and hard work since his suicide attempt and arrest appear to be why his family – his victims – urge for leniency. For the very same reasons we ask the Court to view Charlie's recent progress as a reason to downwardly vary from the advisory guidelines range, his family understands that Charlie's work over the last year-and-a-half illustrates that, for this particular defendant, the goals of § 3553(a) can be accomplished outside the walls of prison.

One victim, a friend of Charlie's for 11 years, commends Charlie for "taking his therapy sessions mindfully." Exhibit G. Kelly Bennett Joyce, Charlie's sister and one of his victims, is impressed by how Charlie has "examine[d] every part of himself to understand his actions," noting that he has "regularly attended psychiatrist and psychologist sessions, kept clear headed and sober and attended AA meetings, has volunteered helping others (teaching English, Salvation Army, etc.) and has made himself available to help anyone in the family that needs him." Exhibit B. Movingly and aptly, his family describes his efforts over the last year and a half as "restitution." Charlie's aunt, Nicolette LaSorella, beautifully writes:

> Over this past year, I've watched my nephew make restitution to his family and our community by doing what he can to give back to us through his volunteering and his participation in our individual lives whether it be physical labor, caring for pets, visits, or his openness to talk about what he has done.
> Exhibit E.

Re:   *United States v. Bennett,*
      15 CR 20

## ARGUMENT

The advisory guidelines yield an overly harsh sentence for this first-time, non-violent offender of at least three and half years in jail. This number is calculated without any consideration of the individualized factors of Mr. Bennett's case, including his demonstrated deep remorse, his efforts at rehabilitation and victim restoration since his suicide attempt and arrest, and his extraordinary family support. In this way, this case illustrates the quintessential problem with the fraud guidelines and highlights why so often in fraud cases courts downwardly vary.[4]

Independent of the guidelines therefore, this Court has the exceedingly difficult task of determining what term of imprisonment sufficiently, without being greater than necessary, accomplishes the sentencing objectives of 18 U.S.C. § 3553 – namely, retribution, deterrence, rehabilitation, and restitution to the victims. With these goals in mind, Mr. Bennett's case is extraordinary in several respects and in each way counsels in favor of a far shorter sentence than that recommended by the guidelines.

A.   A MODEST PRISON SENTENCE SATISFIES
     THE NEED FOR FURTHER PUNISHMENT.

First in connection with the goal of retribution, there is no sentence that will punish Mr. Bennett more harshly than he already has, and continues to, punish himself. Of course, Mr. Bennett's offense – perpetuating an over-one-

---

[4] *See, e.g., United States v. Trebitsch,* 15 cr 450 (VSB) (at 12/16/2015 sentence, Judge Broderick varied from a 51-63 month advisory guidelines range to a 24 month term of imprisonment in a Ponzi scheme offense with losses between $2.5 and $7 million); s*ee also, United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd* 301 Fed. Appx. 93 at *1 (denouncing fraud guidelines as an "utter travesty of justice that sometimes results from the guidelines fetish with abstract arithmetic, and the harm that guidelines calculations can visit on human beings if not cabined by common sense."); *see also United States v. Gupta*, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012) (fraud guidelines are "plucked from the thin air [and] appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology.").

The Honorable Laura Taylor Swain                                          May 5, 2016
Page 11 of 12

Re:   *United States v. Bennett,*
      15 CR 20

million dollar Ponzi scheme against his friends and family – is a very serious one. Mr. Bennett is the first to acknowledge this. And, he is the first to recognize that punishment is in order. Mr. Bennett's suicide attempt was a misdirected attempt at imposing punishment on himself and resulted in immeasurable suffering. Mr. Bennett's suicide attempt also was a byproduct of his extreme remorse for his conduct. In this connection, Mr. Bennett does not need several years behind bars to reflect on the seriousness of his offense or to punish him for his conduct. He has done both on his own.[5]

B.   THE GOAL OF SPECIFIC DETERRENCE
     ALREADY HAS BEEN ACHIEVED.

When Mr. Bennett reflected on his actions he was filled with a self-hate that nearly led to the end of his life. As such, the Court need not impose a lengthy sentence to accomplish specific deterrence. It is hard to imagine a defendant who is less likely to recommit this – or any – offense.

Moreover, Mr. Bennett has spent the last year-and-a-half since his suicide attempt examining what went wrong to further ensure it never happens again. He has acknowledged and examined a cocaine problem, alcohol addiction, and clinical depression that collided at the start of, and throughout, his offense conduct. He has maintained his sobriety since his suicide attempt.

Mr. Bennett also has explored the more subtle and complicated emotional issues that contributed to his downfall. The Charles Bennett who stole his family and friends' money was too proud and too dependent on his community's perception of him as a success to admit failure. The fraud started because Mr. Bennett was too embarrassed to admit he needed a loan and then it was perpetuated for so long because Mr. Bennett suffered from an ego that blinded him to reality. Mr. Bennett genuinely thought that, because he had had so many successes in the past, eventually he would figure out a way to not only make his victims whole, but to provide them with huge returns on each of their investments.

---

[5] Mr. Bennett also has suffered collateral consequences, including losing his license to practice law or participate in any capacity in the securities industry.

The Honorable Laura Taylor Swain										May 5, 2016
Page 12 of 12

Re:   *United States v. Bennett,*
      15 CR 20

Mr. Bennett has spent considerable time in therapy exploring his pride and ego, and the powerful influence – when left unchecked – they have over his actions. Through the hard and brave work he has put forth in treatment, Mr. Bennett stands before the Court a far more retrospective and self-aware man. Today, Mr. Bennett eloquently articulates the emotional issues that contributed to his offense conduct and has resolved to move positively forward from them.

In their attached letters, Mr. Bennett's family and friends commend Mr. Bennett for his impressive work in therapy over the last year. Their first hand observations of the positive impact therapy has had on Mr. Bennett appears to be one of the most significant bases for their pleas for the Court's leniency.

C.   REHABILITATION AND RESTITUTION

On his journey since his suicide attempt, Mr. Bennett continues to struggle with immense remorse. It is not hyperbole to write that Mr. Bennett's every moment is consumed by it. But instead of plunging himself into the despair of it, he is confronting it head-on by trying to make amends in whatever ways possible. In essence, Mr. Bennett has spent, and continues to spend, every day on achieving the goal of rehabilitation. If rehabilitation means anything it means moving forward with lessons learned from past mistakes in an effort to restore not only the defendant to a normal and productive life, but also to restore the victims. Mr. Bennett's victims who have elected to urge this Court for a minimal prison term recognize this. We simply ask that the Court carefully consider their thoughtful and practical request for leniency.

Respectfully submitted,
         /s/
Julia L. Gatto, Esq.
Assistant Federal Defender
212.417.8750

cc:   A.U.S.A. Amy Lester (via hand delivery and ECF)